UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE TORRES



| | |
|---|---|
| ROBERT P. LANG, Individually and On Behalf of All Others Similarly Situated, | No. 13 CV 5852 |
| | CLASS ACTION |
| Plaintiff, | |
| | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| v. | |
| TOWER GROUP INTERNATIONAL, LTD., MICHAEL H. LEE, and WILLIAM E. HITSELBERGER, | JURY TRIAL DEMANDED |
| Defendants. | |

**INTRODUCTION**

1.     This is a securities class action brought by Robert P. Lang ("Plaintiff") individually and on behalf of all persons who purchased or otherwise acquired the common stock of Tower Group International, Ltd., or its predecessor-company Tower Group, Inc. ("Tower" or the "Company"), between July 30, 2012 and August 8, 2013, inclusive (the "Class Period"), against Tower and certain of its officers (collectively "defendants"), for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder. Plaintiff alleges that Tower and members of its senior management made false and misleading statements relating to Tower's business and financial condition and the value of its assets, and violated generally accepted accounting principles ("GAAP") in reporting and accounting for the Company's income, earnings and loss reserves, which artificially inflated the price of the Company's common stock during the Class Period.

2.     The allegations in this complaint are based upon information and belief, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge. Plaintiff bases his belief upon information uncovered through an investigation by Plaintiff's

counsel that included: review of Tower's public filings with the Securities and Exchange Commission ("SEC"); review of Tower's press releases and other public statements; and review of regulatory filings and reports, court filings, securities analyst reports, and media reports about the Company.

## JURISDICTION AND VENUE

3.      The claims asserted arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act. Venue is proper pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Tower has operations in this District, false statements were made in this District, and acts giving rise to the violations complained of occurred in this District.

4.      In connection with the acts alleged in this Complaint, defendants directly or indirectly used the means and instrumentalities of interstate commerce, including without limitation the mails, interstate telephone communications, and the facilities of the national securities exchanges.

## PARTIES

5.      Plaintiff purchased Tower common stock at artificially inflated prices during the Class Period as described in the attached certification and was damaged thereby.

6.      Defendant Tower is a Bermuda-based insurance and reinsurance holding company that offers commercial, personal and specialty insurance products and services in the U.S. through its U.S. insurance subsidiaries and also offers reinsurance products globally. On March 13, 2013, Tower Group, Inc. and Canopius Holdings Bermuda Limited and Canopius Holdings Bermuda Limited (collectively, "Canopius") consummated a stock for stock merger ("Merger") by which Tower Group, Inc. became an indirect wholly-owned subsidiary of Canopius, and changed its name to Tower Group International, Ltd. Tower Group, Inc. is the predecessor company of

2

Tower (references herein to Tower include Tower and Tower Group, Inc.). Prior to the Merger, the Company was incorporated under the laws of the State of Delaware, and was headquartered in New York, New York. Prior to and after the Merger, the Company's stock trades under the symbol TWGP on the NASDAQ. Tower's subsidiaries include Tower Insurance Company of New York ("TICNY"), Tower Risk Management Corp., Tower National Insurance Company, Preserver Group, Inc. ("PGI"), Preserver Insurance Company, Mountain Valley Indemnity Company, North East Insurance Company ("NEIC"), North Atlantic Underwriters, Inc., Ocean II Corporation, Ocean I Corporation, CastlePoint Bermuda Holdings, Ltd. ("CPBH"), CastlePoint Reinsurance Company, Ltd. ("CastlePoint Re"), CastlePoint Management Corp. ("CPM"), CastlePoint Risk Management of Florida, Corp. (f/k/a AequiCap CP Services Group, Inc.), CastlePoint Insurance Company ("CPIC"), 10271 Tower Realty Group, LLC ("10271 Tower"), 10272 Tower Realty Group, LLC ("10272 Tower"), 10273 Tower Realty Group, LLC ("10273 Tower"), CastlePoint Florida Insurance Company, HIG, Inc., Hermitage Insurance Company ("HIC"), Kodiak Insurance Company, American Resources Insurance Consultants, LLC, Specialty Underwriters Alliance, Inc. ("SUA"), CastlePoint National Insurance Company (f/k/a - SUA Insurance Company), SUA Insurance Services, Inc., Hermitage Holdings, Inc., Adirondack AIF, LLC ("AAIF"), Adirondack Insurance Exchange ("AIE"), Massachusetts Homeland Insurance Company, York Insurance Company of Maine, New Jersey Skylands Management, LLC ("NJSM"), New Jersey Skylands Insurance Association ("NJSIA") and New Jersey Skylands Insurance Company.

7.     Defendant Michael H. Lee ("Lee") is Chairman of the Board of Directors, President and Chief Executive Officer ("CEO") of the Company. Prior to the closing of the Merger in March 2013, Lee was Chairman of the Company's board, and President and CEO of

3

the Company since its formation in 1995. Lee signed the Company's materially false and misleading 2010 annual report on Form 10-, filed with the SEC on March 4, 2013. Lee also signed certifications accompanying Tower's SEC filings made pursuant the Sarbanes-Oxley Act of 2002 ("SOX Certification"), including the Form 10-K annual report for 2012, filed with the SEC on March 4, 2013 and quarterly reports on Forms 10-Q for the second and third quarters of 2012 and first quarter of 2013, filed with the SEC on August 8, 2012, November 9, 2012 and May 10, 2013, respectively.

8.     Defendant William E. Hitselberger ("Hitselberger") is Executive Vice President ("EVP") and the Chief Financial Officer ("CFO") of the Company. Prior to the Merger, Hitselberger was EVP and CFO of the Company. Initially, he joined the Company in December 2009 as Senior Vice President and became CFO in March 2010 and EVP in May 2012. Hitselberger signed the Company's materially false and misleading 2012 annual report on Form 10-K, filed with the SEC on March 4, 2013. Hitselberger also signed SOX Certifications accompanying the Company's public filings, including the 2012 annual report on Form 10-K, filed with the SEC on March 4, 2013 and quarterly reports on Forms 10-Q for the second and third quarters of 2012 and for the first quarter of 2013, filed with the SEC on August 8, 2012, November 9, 2012 and May 10, 2013, respectively.

9.     Defendants Lee and Hitselberger (collectively, the "Individual Defendants") possessed the power and authority to control the contents of Tower's annual and quarterly reports, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their

4

access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## FACTS

### A. Background

10. Tower is a holding company that provides through its operating subsidiaries general commercial, specialty commercial, personal property and casualty insurance products in various industries and to individuals throughout the United States and Bermuda. Tower provides these products on both an admitted and an excess and surplus ("E&S") line basis. Insurance companies writing on an admitted basis are licensed by the states in which they sell policies and are required to offer policies using premium rates and forms that are filed with state insurance regulators. Non-admitted carriers writing in the E&S market are not bound by most of the rate and form regulations imposed on standard market companies, allowing them the flexibility to change the coverage offered and the rate charged without the time constraints and financial costs associated with the filing process. According to Tower's 2012 annual report on Form 10-K, a substantial part of its business is focused in the Northeastern United States.

11. Tower presents its business results through three business segments: Commercial Insurance, Personal Insurance and Insurance Services. The Company's Commercial Insurance segment is focused on property and casualty insurance products through several business units to customers in general commercial and specialty commercial markets. The Commercial Insurance products include commercial package, general liability, workers' compensation, commercial automobile, fire and allied, inland marine and commercial umbrella policies. As of December

31, 2012, approximately 55% of the direct premiums written by the Commercial Insurance segment were from the Northeastern United States.

12.    The Company's Personal Insurance segment offers mono line homeowners, mono line automobile insurance and ancillary personal lines coverage (renters, condo, dwelling fire, scheduled articles, umbrella and boats).  Tower distributes these products through a network of approximately 500 retail agents, national brokers and other insurance companies.  The customers in this segment are concentrated in the Northeastern United States, with 86% of the premium volume produced in the Northeast, including New York, New Jersey and Massachusetts.

13.    Tower's Insurance Services segment generates fees from performing various aspects of insurance company functions for other insurance companies, including underwriting, claims administration, operational and technology services.  These services are provided through Tower's managing general agencies and management companies.  The Company's primary source of fee income is from the Reciprocal Exchanges, for which it manages the day-to-day operations in exchange for a management fee.  In 2012, management fee income was $30.2 million.

14.    The results of Tower's operations and financial condition depend on the Company's ability to estimate the potential losses associated with the risks it insures and reinsures.  Tower estimates loss and loss adjustment expense reserves to cover its estimated liability for the payment of all losses and loss adjustment expenses ("LAE") incurred under the policies it writes.  To the extent that loss and LAE exceed Tower's estimates, it is required to immediately recognize the less favorable experience and increase loss and loss adjustment expense reserves, with a corresponding reduction in its net income in the period in which the deficiency is identified.

15.     Tower generates revenues from net premiums earned, ceding commission revenue, insurance service revenue and net investment income and realized gains and losses on investments; it incurs expenses from losses and LAE, operating expenses, interest expense and income taxes.   Tower measures earnings in terms of net income attributable to the parent company and return on average equity.

16.     During the second quarter of 2012, Tower agreed to invest approximately $75 million to acquire a 10.7% stake in Canopius Group Limited ("Canopius Group").  In connection with that investment, Tower also entered into an agreement dated April 25, 2012 (the "Master Transaction Agreement") under which Canopius Group agreed to assist Tower with the establishment of a presence at Lloyd's of London and granted Tower the option (the "Merger Option") to combine with Canopius. On July 30, 2012, Tower exercised its Option and executed a merger agreement ("Merger Agreement") with Canopius, pursuant to which Canopius would acquire all of Tower's common stock, with Tower regarded as the acquiring entity.

17.     At the same time Tower announced that it had entered into the Merger Agreement on July 30, 2012, it also announced that it took a reserve adjustment of $42 million after-tax, or $65 million on a pre-tax basis, claiming "[t]his reserve charge should allow Tower's financial results to fully reflect current accident year profitability going forward."   The loss reserve strengthening related primarily to unfavorable development in the Company's Commercial Insurance segment arising from changes in estimated and ultimate losses for accident years 2011 and prior.

18.     Loss reserves are liabilities established by insurers and reinsurers to reflect the estimated cost of claims payments that the insurer or reinsurer believes will ultimately be

7

required to pay with respect to insurance or reinsurance it has written. Reserves are established for losses and LAE and consist of case reserves and incurred but not reported ("IBNR") reserves.

19.     The Merger with Canopius was consummated on March 13, 2013.

20.     Shortly after the Merger, on May 10, 2013, the Company filed its first quarter earnings 2013 results with the SEC. These financial results reflected the first results following the completion of the Merger. Despite the acquisition of Canopius, the Company's loss and loss adjustment expenses in the first quarter of 2013 remained relatively flat compared to the same quarter prior year's reserves, increasing by only $7 million, or less than 3%. Further, the Company took a modest adverse reserve development despite the fact that it made $70.9 million of addition to its reserves as it suffered loss from commercial insurance written in 2009 – 2011. Defendants understated Tower's provision for losses, and in so doing, artificially inflated the Company's earnings and stock price during the Class Period.

21.     On August 7, 2013, the Company issued a press release announcing that it would need additional time to review matters relating to the estimate of its loss reserves and its allocation of goodwill and certain tax accounts. The Company claimed the additional time was needed as a result of the changes in the Company's operating and reporting segments and updates to its internal controls in the second quarter of 2013 in light of the Merger. However, the Company had already issued its first quarter earnings report, which included the combined Company's operating results post-Merger.

22.     In this way, defendants, in violation of Generally Accepted Accounting Principles ("GAAP") and Tower's own internal policies, caused Tower to knowingly and recklessly delay the recognition of losses which caused the Company's common stock to trade at an artificially inflated price.

8

23.     On August 8, 2013, the Company provided guidance on its second quarter 2013 results wherein it disclosed that the Company may record adverse reserve development of $60 million to $110 million pre-tax. In other words, the increases in Tower's loss reserves (assuming a $110 million pre-tax reserve development) could be 69% greater than the reserve adjustment it took in its second quarter operating results in 2012. The Company also disclosed that it had hired an independent actuarial firm to review selected areas of its loss reserves as of June 30, 2013.

24.     Following this news, the price of Tower's shares dropped $5.20 per share, or more than 24%, to a closing price of $16.41 per share on August 8, 2013.

25.     The investing public had no reason to believe that defendants had masked the problems associated with its internal policies concerning loss reserves until August 8, 2013, when the Company postponed the release of its financial results for that quarter in order to estimate the Company's loss reserve and the related impact to the recoverability of its goodwill and deferred tax assets and announced that it expected to record an adverse reserve development of $60 million to $110 million pre-tax.

26.     On August 12, 2013, A.M. Best Co. placed under review with negative implications the ratings of certain companies owned by Tower.

**B.     Defendants Decide to Pursue the Acquisition of Canopius**

27.     As early as April 2011, Lee, on Tower's behalf, expressed an interest in providing qualifying quota share capacity for Canopius. Tower's expressed interest ultimately led to the April 25, 2012 investment agreement between Tower and Canopius and the Master Transaction Agreement, which included the Option right.

28.     On August 20, 2012, Tower Group closed on its previously announced $74.9 million acquisition of a 10.7% stake in Canopious, a privately owned Lloyd's insurance holding

company domiciled in Guernsey, Channel Islands. In connection with this acquisition, Tower also entered into an agreement dated April 25, 2012, which, among other things, granted Tower the Merger Option.

29.     On July 30, 2012, Tower announced that it had exercised the Merger Option and entered into the Merger Agreement. On March 13, 2013, Canopius and Tower consummated the Merger.

30.     In connection with the Merger, from the start it was contemplated that Tower's existing executive officers would be the executive officers of the combined company, including defendants Lee and Hitselberger. Also, pursuant to the Merger Agreement and the Company's Long-Term Equity Plan, all unvested stock options and restricted stock awards automatically vested upon the closing of the Merger. To that end, Lee was paid approximately $3.4 million (from the vesting of his restricted stock) and Hitselberger received a payment of just under $700,000.

31.     In addition, in connection with the Merger, Lee and Hitselberger are entitled to change of control benefits in the event they are terminated within the 24 months following the Merger. The estimated golden parachute payments, assuming the termination of their employment would be: Lee, $11,082,095; Hitselberger, $1,878,221.

32.     From at least April 2011 forward through the end of the Class Period, the defendants focused their efforts on making Tower an attractive purchaser candidate in order to secure the Merger with Canopius and maximize the payouts to the Individual Defendants.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS
## AND OMISSIONS OF MATERIAL FACTS

33. During the Class Period, Tower's representations about its conservative loss reserve estimates and solid performance were materially false and misleading because its income and earnings were materially overstated throughout the Class Period.

34. Throughout the Class Period, Tower made false and misleading statements representing that its loss reserves and LAE were calculated using methods that took into account loss ratio estimates for the current accident year and the loss development factor selections for all accident years. According to Tower's amended annual report for 2012 filed on Form 10-K/A, "the loss ratio estimate for the current accident year is selected after reviewing historical accident year loss ratios adjusted for rate changes, trend, and mix of business." However, Tower consistently did not adhere to its own policies in estimating its loss reserves and LAE and regularly under-reserved for its losses. In addition, Tower's loss reserves and LAE were insufficient to absorb its actual losses as its insurance portfolios expanded as a result of the Merger. Plaintiff and the Class could not have known that the Company's loss reserves and LAE were not calculated in accordance with the Company's publicly-disclosed methodology until the Company postponed the release of its financial results for the second quarter of 2013 and indicated that it would likely take yet another reserve adjustment of $60 million to $110 million pre-tax.

35. Because Tower's reserves were not calculated in conformity with GAAP or with the Company's publicly-disclosed methodology for allocating reserves, defendants issued materially false and misleading statements regarding the Company's business and financial results. As a result of defendants' false statements, Tower's stock traded at artificially inflated prices during the Class Period.

11

A.    **Second Quarter 2012**

36.    The Class Period begins on July 30, 2012.  On that date, Tower issued a press release announcing that it had entered into the Merger Agreement with Canopius and provided an estimate of second quarter 2012 operating results, including a reserve adjustment of $42 million after-tax.  With respect to the reserve adjustment, the Company disclosed the following:

> Tower also conducted a comprehensive review of its reserves in the second quarter and strengthened its reserves by $42 million after-tax.  This reserve charge should allow Tower's financial results to fully reflect current accident year profitability going forward.

> * * *

> Tower conducted a comprehensive review of its loss reserves in the second quarter and strengthened prior accident year reserves by $65 million on a pre-tax basis following an analysis of recent loss emergence that occurred during the quarter. The reserve strengthening in the second quarter is expected to represent about 4% of the company's consolidated loss reserves (excluding the reserves that are carried by the reciprocal insurance companies managed by Tower). It culminates a multi-year effort that began in the fourth quarter 2009 to mitigate soft market conditions. The loss ratio after the reserve strengthening for the accident years from 2008 to 2011 continues to remain favorable at 62.3%, excluding storm losses. This reserve charge should allow Tower's prospective financial results to fully reflect current accident year profitability going forward.

> The reserve strengthening relates primarily to unfavorable development in the company's Commercial Insurance segment arising from changes in estimated ultimate losses for accident years 2011 and prior. During the quarter Tower conducted detailed reserve studies for all lines using loss data through the first quarter of 2012 as well as reported claims during the second quarter, including analysis of the source of unusually high reported loss emergence for certain casualty lines, primarily workers' compensation and commercial automobile, observed during the first quarter of 2012.

> Based on analysis of additional loss data through the second quarter of 2012, the loss emergence for the second quarter is consistent with expectations implied by the increased level of carried reserves.

> * * *

> Commenting on the reserve charge, Michael H. Lee said "During the quarter, as a part of our strategic review, we conducted a comprehensive analysis of our prior accident year reserves and reviewed our underwriting and pricing of current

accident year business. Based on these reviews, we strengthened our prior
accident year reserves to address recently observed higher than expected loss
emergence primarily on business that we have been terminating for the last
several years. On a more positive note, due to the multi-year actions to reduce our
claims costs, corrective underwriting, the organic growth initiative that we
recently implemented, and improved market conditions, we believe our current
business is much better positioned to achieve the desired underwriting results and
incorporates the impact of the loss trends that have emerged on the prior accident
year business. *We believe we have taken decisive actions to address our reserve
position from prior accident years, and our ongoing results should better reflect
the underwriting profitability of our ongoing business. Our guidance for the
remainder of 2012 and 2013 reflects the strength of our ongoing business."*
[Emphasis added.]

37.     On August 6, 2012, Tower issued a press release discussing its second quarter

2012 financial results. The Company reported "net loss attributable to common shareholders in

the second quarter of 2012 of $15.1 million, or ($0.39) per diluted share. Net income attributable

to common shareholders in the second quarter of 2011 was $24.1 million, or $0.58 per diluted

share."

38.     With respect to its loss reserves and loss adjustment expenses, Lee stated:

As part of our strategic review during the second quarter, we conducted a
comprehensive review of our prior accident year and strengthened our prior
accident year reserves. We believe we have taken decisive actions to address our
reserve position from prior accident years, so that our future results should better
reflect the underwriting profitability of our ongoing business.

* * *

In summary, due to our transaction with Canopius, actions that we have taken this
quarter with respect to our reserve position, the success of the organic growth
initiative and improving market conditions, we have a positive outlook for the
remainder of 2012 and 2013.

39.     On August 8, 2012, the Company released its quarterly report for the second

quarter of 2012on Form 10-Q.  With respect to its loss and loss adjustment expenses, the

Company stated:

13

The increase in estimates of prior years' loss and loss expenses was the result of a comprehensive review of its loss reserves in the second quarter and strengthened prior accident year reserves by $65 million following an analysis of recent loss emergence that occurred during the first and second quarters of 2012. The reserve strengthening in the second quarter represents 4% of the company's consolidated loss reserves (excluding the reserves that are carried by the Reciprocal Exchanges).

40.     Though these reserve adjustments were warranted, the Company still failed to adequately set aside reserves during the following quarters despite knowing of its impending Merger with Canopius.

41.     The Form 10-Q filed on August 6, 2012 was signed by Lee and Hitselberger. Lee and Hitselberger also signed the SOX Certification that falsely stated that Tower's second quarter 2012 10-Q did not contain any false or misleading statements or omit to state any fact necessary to make statements made not misleading, and that the statements fairly presented the financial condition and results of operations and that Tower's financial statements were prepared in accordance with GAAP.

42.     The statements set forth above were false and misleading for at least the following reasons:

> i.      Tower's disclosures regarding the adequacy of loss and loss adjustment expense reserves were false and misleading because, throughout the Class Period, Tower consistently under-reserved its loss and LAE;
>
> ii.     Statements that Tower's financial statements were fairly presented in accordance with GAAP and were free of material misrepresentations were false and misleading.  Tower's financial statements misrepresented its income and earnings in violation of GAAP;

iii.     Statements concerning the value of the Company's goodwill were false
and misleading because they omitted to state that the goodwill impacted by
reserve adjustments was impaired.

**B.     Third Quarter 2012**

43.     On November 9, 2012, Tower filed its quarterly report on Form 10-Q with the

SEC disclosing net operating income of $23.8 million or $0.62 per diluted share compared with

operating loss of $15.3 million, or ($0.38) per diluted share during same period the prior year.

The Company posted total revenue of $474.9 million, up 4.3% year over year. The growth was

primarily attributable to increased net premiums earned during the quarter.

44.     On November 7, 2012, in Tower's press release discussing the financial results

for the third quarter 2012, Lee discussed the impact of Superstorm Sandy on the Company's loss

reserves which he considered the largest catastrophic event in the Company's history:

> While it is premature to estimate the full extent of our insured losses, we are
> confident that our capital position for the year will not be materially impaired
> based on the claims reporting pattern thus far, our underwriting profile and robust
> reinsurance program, which was substantially strengthened after Hurricane Irene
> last year.

45.     During the November 8, 2012 investor's earnings conference call, Lee stated that

"[t]he third quarter 2011 numbers had the effects of Hurricane Irene and some loss reserve

strengthening, while this year's third quarter results had no catastrophe losses or reserve

strengthening." Also during the conference call, Hitselberger confirmed that the Company

neither strengthened nor released its loss reserve.

> Question: Okay. And second question is, was there any reserve development
> strengthening or release in the quarter?
>
> Answer (Hitselberger): No, I think we had mentioned that. You'll see in the --
> when the Q gets filed. I think by segment, there was a net. So I think either one
> segment had a charge of $200,000, the other segment had a reserve release of

15

$220,000. So I think overall, our development was -- it was less than $10,000 or $20,000.

46. The Company's loss and LAE reserves were relatively flat despite the fact that it had recorded an adverse development of $60 million in the prior quarter and was moving toward completing the Merger with Canopius.

47. The statements set forth above were false and misleading for at least the following reasons:

   i. Tower's disclosures regarding the adequacy of loss and loss adjustment expense reserves were false and misleading because, throughout the Class Period, Tower consistently under-reserved its loss and LAE;

   ii. Statements that Tower's financial statements were fairly presented in accordance with GAAP and were free of material misrepresentations were false and misleading. Tower's financial statements misrepresented its income and earnings in violation of GAAP;

   iii. Statements concerning the value of the Company's goodwill were false and misleading because they omitted to state that the goodwill impacted by reserve adjustments was impaired.

C. **Fourth Quarter 2012 and Full Year 2012**

48. On February 25, 2013, Tower issued a press release announcing its fourth quarter 2012 and year-end 2012 earnings results. The Company reported fourth quarter 2012 net loss of $52.1 million or ($1.36) per share, compared to fourth quarter 2011 net income of $25.3 million or $0.64 per diluted share. For the full year 2012, net loss attributable to common shareholders was $28.2 million or ($0.73) per share, compared to full year 2011 net income of $60.5 million or $1.48 per diluted share.

16

49.     Tower's results in the fourth quarter and full year 2012 included losses from Superstorm Sandy, to which Tower had exposure through its direct insurance operations, its assumed reinsurance business, and certain of its alternative investments. In aggregate, Tower's after-tax net losses in the fourth quarter and full year 2012 from Superstorm Sandy were $80.1 million, or ($2.09) per diluted share.

50.     The Company posted total revenue of $475.0 million, up 4.4% year over year. The growth was primarily attributable to increased net premiums earned. Gross premiums written were reported at $481.2 million, up 10.8% year over year. Net investment income was $30.1 million compared to $32.1 million in the year-ago quarter.

51.     Despite the Company's losses due to Superstorm Sandy, in a press release issued on February 25, 2013, Lee again put a positive spin on the Company's business prospects, stating: "Tower is also progressing well with our proposed merger transaction with the Bermuda reinsurance business of Canopius.... As a result of our progress in advancing our long-term strategy, including the Canopius transaction, as well as the positive signs we are observing in the marketplace, we believe we are on track to return to profitability in 2013."

52.     On March 4, 2013, Tower filed its 2012 annual report on Form 10-K with the SEC.

53.     With respect to its loss and LAE reserves, the Company represented the following:

> We are required to establish reserves for incurred losses that are unpaid, including reserves for claims and loss adjustment expenses, which represent the expenses of settling and adjusting those claims. These reserves are balance sheet liabilities representing estimates of future amounts required to pay losses and loss expenses for insured and/or reinsured claims that have occurred at or before the balance sheet date, whether already known to us or not yet reported. Our policy is to establish these losses and loss reserves after considering all information known to us as of the date they are recorded.

17

Loss reserves fall into two categories: case reserves for reported losses and loss expenses associated with a specific reported insured claim, and reserves for incurred but not reported ("IBNR") losses and loss adjustment expenses. We establish these two categories of loss reserves as follows:

- *Reserves for reported losses*—When a claim is received from an insured, broker or ceding company, or claimant we establish a case reserve for the estimated amount of its ultimate settlement and its estimated loss expenses. We establish case reserves based upon the known facts about each claim at the time the claim is reported and may subsequently increase or reduce the case reserves as our claims department deems necessary based upon the development of additional facts about the claim.

- *IBNR reserves*—We also estimate and establish reserves for loss and loss adjustment expense ("LAE") amounts incurred but not yet reported, including expected development of reported claims. IBNR reserves are calculated as ultimate losses and LAE less reported losses and LAE. Ultimate losses are projected by using generally accepted actuarial techniques.

54. The Company also disclosed the following relating to critical accounting estimates:

*Loss and loss adjustment expense reserves.* The reserving process for loss and LAE reserves provides management's best estimate at a particular point in time of the ultimate unpaid cost of all losses and LAE incurred, including settlement and administration of losses, and is based on facts and circumstances then known and including losses that have been incurred but not yet reported. The process includes using actuarial methodologies to assist in establishing these estimates, judgments relative to estimates of future claims severity and frequency, the length of time before losses will develop to their ultimate level and the possible changes in the law and other external factors that are often beyond our control. There are various actuarial methods that are appropriate for the different lines of business, and our actuaries' use of a particular method or weighting of methods depends in part on the maturity of each accident year by line of business, the limits of liability covered under the policies, the presence or absence of large claims in the experience, and other considerations. In general, the various actuarial methods can be grouped into three categories: loss ratio projection, loss development methods, and the B-F method. For the most recent accident year, and especially for liability lines of business, the actuarial method given the most weight is usually the loss ratio method, since the percentage of ultimate claims reported to date is expected to be low and the immature reported claims experience is not a reliable indicator of ultimate losses for that accident year. For property lines of business for the most recent accident year, the B-F method is usually given the most weight, because experience typically shows that there is a small percentage

of claims reported in the subsequent period due to normal lags in reporting and processing of claims in these lines of business that can be relatively reliably estimated as a percentage of premiums, which is reflected in the B-F method. For each line of business, the actuarial reserving method usually given the most weight shifts from the loss ratio projection to the B-F method to the incurred loss projection as each accident year matures. These methods are described in "Business—Loss and Loss Adjustment Expense Reserves."

This process helps management set carried loss reserves based upon the actuaries' best estimates, using estimates made by segment, product or line of business, territory, and accident year. The actuaries also separately estimate loss reserves from LAE reserves and within LAE reserves estimates are made for defense and cost containment expenses or Allocated Loss Adjustment Expenses ("ALAE") and for other claims adjusting expenses or Unallocated Loss Adjustment Expenses ("ULAE"). The amount of loss and LAE reserves for reported claims is based primarily upon a case-by-case evaluation of coverage, liability, injury severity, and any other information considered pertinent to estimating the exposure presented by the claim. The amounts of loss and LAE reserves for unreported claims are determined using historical information by line of business as adjusted to current conditions. Due to the inherent uncertainty associated with the reserving process, the ultimate liability may differ, perhaps substantially, from the original estimate. Such estimates are regularly reviewed and updated, and any resulting adjustments are included in the current year's results. Reserves are closely monitored and are recomputed periodically using the most recent information on reported claims and a variety of statistical techniques. Specifically, on at least a quarterly basis, we review, by line of business, existing reserves, new claims, changes to existing case reserves and paid losses with respect to the current and prior years. See "Business—Loss and Loss Adjustment Expense Reserves" for additional information regarding our loss and LAE reserves.

We segregate our data for estimating loss reserves. The property lines include Fire and Allied Lines, Homeowners-property, Commercial Multi-peril Property, Multi-Family Dwellings, Inland Marine and Automobile Physical Damage. The casualty lines include Homeowners-liability, Commercial Multi-peril Liability, Other Liability, Workers' Compensation, Commercial Automobile Liability, and Personal Automobile Liability. Commercial Insurance segment reserves are estimated separately from Personal Insurance segment reserves. For the Commercial Insurance segment we analyze reserves by line of business and, where appropriate, we further segregate the data for analysis purposes between small, middle and large policies sizes and by state or region. We also analyze various producers' business separately where the volume of business from those producers is considered significant and the characteristics of the business from those particular producers are perceived to be different. Within the Personal Insurance segment, we estimate loss and loss expenses reserves separately for the Reciprocal Exchanges, which we manage, and for our owned companies. We

utilize line of business breakdowns and, where appropriate, analyze results separately by state.

55.     In the 2012 Form 10-K, the Company also disclosed that, as of December 31, 2012, the Company estimated that the loss reserves established for the prior year, as of December 31, 2011, had a $69.3 million deficiency as compared to the original net liability estimated at December 31, 2011. In other words, defendants knew that the Company's loss and loss adjustment reserve practices were inadequate and had under-reserved in 2011. Nonetheless, the Company estimated its net reserves to be $1,398.9 million, only about 1.2% more than the 2011 net re-estimate reported in the 2012 10-K, despite the fact that the Company's gross premiums written were reported at $481.2 million, up 10.8% from the prior year and the Company was to complete the Merger with Canopius in the next reporting period.

56.     On the February 26, 2013 investor earnings conference call, Hitselberger's answer to an analyst's question confirmed the Company's laissez faire attitude regarding its loss reserves:

Question: Okay. And then on -- as far as the reserves, I think you said there is no development or no -- not much development during the quarter. If we look at it by segment, would either the commercial or personal lines have either favorable or adverse development for the quarter?

Answer: Yes, and that's a good question. No, the overall development for both segments was basically 0 for the quarter. And it was, again, it was 0 for the entire second half of the year since we took that reserve charge.

57.     The fourth quarter and year-end 2012 results on Form 10-K was signed by Lee and Hitselberger. Lee and Hitselberger also signed the SOX Certification that falsely stated that Tower's 2012 10-K did not contain any false or misleading statements or omit to state any fact necessary to make statements made not misleading, and that the statements fairly presented the

financial condition and results of operations and that Tower's financial statements were prepared in accordance with GAAP.

58.     The statements set forth above were false and misleading for at least the following reasons:

>    i.      Tower's disclosures regarding the adequacy of loss and loss adjustment expense reserves were false and misleading because, throughout the Class Period, Tower consistently under-reserved its loss and LEA;

>    ii.     Statements that Tower's financial statements were fairly presented in accordance with GAAP and were free of material misrepresentations were false and misleading.   Tower's financial statements misrepresented its income and earnings in violation of GAAP;

>    iii.    Statements concerning the value of the Company's goodwill were false and misleading because they omitted to state that the goodwill impacted by reserve adjustments was impaired.

### D.     First Quarter 2013

59.     Shortly after the consummation of the Merger with Canopius, on May 10, 2013, Tower filed its first quarter 2013 results on Form 10-Q with the SEC. These financial results reflected the first quarter results following the completion of the Merger.   The Company disclosed that the Merger was accounted for as a reverse acquisition and recapitalization under which Tower Group Inc. was identified and treated as the accounting acquirer and that the historical results prior to the first quarter 2013 reflected only the financial results reported by Tower Group Inc., with equity accounts and earnings per share restated to reflect Tower's new capitalization.

21

60.     In the first quarter 2013 report, Tower disclosed that revenue rose 1.89% to $475.28 million from the year-earlier quarter. Adjusted earnings per share increased 14.29% to $0.56 in the quarter versus EPS of $0.49 in the year-earlier quarter. By that measure, the Company beat the mean analyst estimate of $0.54 and beat the average revenue estimate of $415.48 million.

61.     Despite the fact that the Company's gross premiums written and managed increased 18%, driven primarily by growth in assumed business of $56.8 million, the Company only minimally increased (by less than 3%) its loss and LAE compared to the same quarter in the prior year.

62.     In connection with the Company's reported results, in a press release dated May 8, 2013, Lee provided his positive, but misleading, spin on Tower's business operations, as follows: "Tower is off to a strong start in 2013, marked by solid financial performance in the first quarter and the successful completion of our transformational merger," and "With our new and improved business model resulting from the Canopius Bermuda merger, we are well positioned to continue making progress in successfully implementing our long-term business plan, including achieving higher returns in the remainder of 2013 and beyond."

63.     The statements set forth above were false and misleading for at least the following reasons:

      i.    Tower's disclosures regarding the adequacy of loss and loss adjustment expense reserves were false and misleading because, throughout the Class Period, Tower consistently under-reserved its loss and LAE;

      ii.    Statements that Tower's financial statements were fairly presented in accordance with GAAP and were free of material misrepresentations were

22

false and misleading. Tower's financial statements misrepresented its income and earnings in violation of GAAP;

iii.    Statements concerning the value of the Company's goodwill were false and misleading because they omitted to state that the goodwill impacted by reserve adjustments was impaired.

iv.    Statements concerning the Company's deferred tax assets were false and misleading because they omitted to state that the Company did not properly account for the tax benefits generated by the losses in the Company's U.S. operations.

64.    The Form 10-Q filed on May 10, 2013 was signed by Lee and Hitselberger. Lee and Hitselberger also signed the SOX Certification that falsely stated that Tower's first quarter 2013 10-Q did not contain any false or misleading statements or omit to state any fact necessary to make statements made not misleading, and that the statements fairly presented the financial condition and results of operations and that Tower's financial statements were prepared in accordance with GAAP.

## THE TRUTH EMERGES

65.    As set forth above, the Company disclosed the fraud alleged herein on August 7 and August 8, 2013. On August 7, 2013, the Company issued a press release announcing that it was postponing the release of its financial results for the second quarter of 2013 and its previously scheduled conference call to discuss the results and that "additional time is needed to review matters relating to the estimate of loss reserves and, primarily due to the integration of the Canopius Bermuda mergers, its allocation of good will and certain tax accounts."

66.     On August 8, 2013, the Company provided guidance on its second quarter 2013

results wherein it disclosed that the Company could record adverse reserve development of $60

million to $110 million pre-tax:

> Loss reserves. The Company has retained an independent actuarial firm to review
> selected areas of the Company's loss reserves as of June 30, 2013. This review
> process by an independent actuarial firm is typically conducted at year-end, but
> the Company will use the report of the outside actuarial firm in connection with
> establishing its loss reserves as of June 30, 2013. Based upon currently available
> information, the Company could record adverse reserve development of $60
> million to $110 million pre-tax.
>
> Taxes. Losses in the Company's U.S. operations are generally offset by a tax
> benefit of 35% of such loss. Based upon currently available information, the
> Company expects that 60% of anticipated losses from adverse loss reserve
> development will come from its U.S.-taxed businesses. The expected tax benefit
> from such U.S. losses will not be realized in the second quarter, but will only be
> recognized if the Company generates additional earnings in its U.S. businesses.
> The Company would use any such tax benefits to offset future U.S. taxable
> earnings and capital gains from the anticipated rebalancing of the Company's
> fixed income investment assets consistent with its new corporate structure.
>
> Goodwill. The Company revised its segment reporting in the second quarter of
> 2013 to reflect the changes to its corporate structure after the merger with
> Canopius Bermuda. As a result of this change in segment reporting, goodwill has
> been allocated to each business segment. To the extent that the loss reserve
> adjustment adversely impacts one segment, goodwill associated with that segment
> may be impaired, and a non-cash charge for such goodwill would be recorded.
> This analysis and charge, if any, will be calculated upon the completion of the
> reserve review.
>
> Net Income. The Company's operating results for the quarter will be driven by
> strong operating results from its Bermuda operations offset by the anticipated
> reserve strengthening. The Company will not record any tax benefit during the
> quarter to offset the anticipated losses in the U.S. The Company believes that at a
> reserve adjustment of $60 million, it would record operating earnings of
> between $.15 and $.20 per share, including a deferred tax valuation allowance of
> between $.35 and $.40 per share, and at a charge of $110 million its operating loss
> would be between $.80 and $.85 per share, including a deferred tax valuation
> allowance of between $.18 and $.23 per share. These estimates exclude the non-
> cash effect of any goodwill impairment.

67.     The increases in Tower's loss reserves (assuming a $110 million pre-tax reserve development) could be 69% greater than the reserve adjustment it took in its second quarter operating results in 2012.

68.     Following this news, the price of Tower's shares dropped $5.20 per share, or more than 24%, to a closing price of $16.41 per share on August 8, 2013.

## ADDITIONAL SCIENTER ALLEGATIONS

69.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Tower, their control over, and receipt or modification of Tower's allegedly materially misleading statements and their associations with the Company which made them privy to confidential proprietary information concerning Tower, participated in the fraudulent scheme alleged herein.

70.     Defendants Lee and Hitselberger were further motivated to engage in this course of conduct in order to secure benefits in the Merger with Canopius. In connection with the Merger, from the start it was contemplated that Tower's existing executive officers would be the executive officers of the combined company, including defendants Lee and Hitselberger.  Also, pursuant to the Merger Agreement and the Company's Long-Term Equity Plan, all unvested stock options and restricted stock awards automatically vested upon the closing of the Merger. To that end, Lee was paid approximately $3.4 million (from the vesting of his restricted stock) and Hitselberger received a payment of just under $700,000.

71. In addition, in connection with the Merger, Lee and Hitselberger are entitled to change of control benefits in the event they are terminated within the 24 months following the Merger, which in total (assuming the termination of their employment) would be: Lee, $11,082,095; Hitselberger, $1,878,221.

72. From at least April 2011 forward through the end of the Class Period, the defendants focused their efforts on making Tower an attractive purchaser candidate in order to secure the Merger with Canopius and maximize the payouts to the Individual Defendants.

73. The payments these defendants received or may receive strongly indicate their motivation and intent to use the Merger as a means to extract large personal payments, raising a strong inference of scienter.

74. Further, Tower's executive officers, including Lee and Hitselberger, were to continue their employment with the company immediately following the closing of Merger.

## PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

75. From the beginning of the Class Period, Tower common stock has traded on the NASDAQ. At all relevant times, Tower common stock traded in an efficient market that promptly digested current information with respect to Tower from publicly available sources and reflected such information in the prices of Tower's shares.

76. The evidence that Tower common stock traded on an efficient market at all relevant times includes the following:

    i. Tower common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

    ii. As a regulated issuer, Tower filed periodic public reports with the SEC and the NASDAQ;

26

iii.     The average weekly trading volume during the Class Period was over 340,000;

iv.     During the Class Period, Tower was followed by several securities analysts who wrote reports about Tower that were distributed to their clients. Each of these reports were publicly available and entered the public marketplace;

v.      Tower regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

77.     Based on these indicia, a presumption of reliance applies.

## LOSS CAUSATION/ECONOMIC LOSS

78.     By misrepresenting its financial outlook, risk exposure, and the value of its assets, the defendants presented a misleading picture of Tower's business and prospects. Thus, instead of truthfully disclosing during the Class Period that Tower's income and earnings were being inflated through accounting techniques that violated GAAP and SEC rules, such as failing to establish adequate reserves for incurred losses and loss expenses and failing to properly value goodwill and realize tax benefits relating to losses in the Company's operations, defendants falsely reported Tower's financial condition and outlook.

79.     The Company's statements concerning its profitability, claims and loss reserving practices and the fair representation of the value of the Company's assets, as described

27

hereinabove, caused and maintained the artificial inflation in Tower's stock price throughout the Class Period, until the truth was revealed to the market.

80. Defendants' false and misleading statements had the intended effect and caused Tower's stock to trade at artificially inflated levels throughout the Class Period, reaching its Class Period high of over $22.08 per share (on July 25, 2013).

81. As alleged hereinabove, the truth about Tower's overstatement of its financial condition and outlook emerged on August 7 and August 8, 2013. On this news, the Company's stock price dropped over 25% from $21.61 at the close of business on August 7, 2013 to $16.41 at the close of business on August 8, 2013.

## NO SAFE HARBOR

82. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Complaint. Many of the specific statements described herein were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Tower who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

83. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Tower

28

common stock during the period July 30, 2012 through and including August 8, 2013 (the "Class"). Excluded from the Class are defendants, other officers and directors of Tower at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

84.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. At all relevant times, Tower had over 38 million shares of stock outstanding, which were owned publicly by at least hundreds of persons and entities.

85.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a.     whether the Securities Exchange Act of 1934 was violated by defendants;

    b.     whether defendants omitted and/or misrepresented material facts;

    c.     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

    d.     whether defendants knew or deliberately disregarded that their statements were false and misleading;

    e.     whether the price of Tower's common stock was artificially inflated; and

    f.     the extent of damage sustained by Class members and the appropriate measure of damages.

86.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from defendants' wrongful conduct.

87.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

88.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT ONE
### For Violation of § 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

89.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

90.     Plaintiff asserts this Count pursuant to § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against defendants Tower, Lee and Hitselberger.

91.     During the Class Period, defendants disseminated or approved the false statements set forth above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

92.     Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

        a.     employed devices, schemes and artifices to defraud;

        b.     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        c.     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Tower common stock during the Class Period.

93.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Tower common stock. Plaintiff and the Class would not have purchased Tower common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT TWO
### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

94.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

95.     Plaintiff asserts this Count pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

96.     The Individual Defendants, by virtue of their leadership positions in Tower, had the power and authority to cause Tower to engage in the wrongful conduct complained of herein.

97.     The Individual Defendants possessed the power and authority to control the contents of Tower's annual and quarterly reports and press releases. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

98.     Tower violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in the Complaint, and as a direct and proximate result of those violations, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

99.     By reason of their control of Tower, the Individual Defendants are liable pursuant to

Section 20(a) of the Exchange Act for Tower's violations of Section 10(b) and Rule 10b-5, to the

same extent as Tower.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.      Awarding Plaintiff and the members of the Class damages, including interest;

C.      Awarding Plaintiff reasonable costs and attorneys' fees; and

D.      Awarding Plaintiff such equitable/injunctive or other relief in Plaintiff's favor as

the Court may deem just and proper.

## JURY DEMAND

Plaintiff, on behalf of himself and the Class, hereby demands a trial by jury.

Dated: August 20, 2013

GARDY & NOTIS, LLP

By: _Meagan Farmer_

Meagan A. Farmer
Mark C. Gardy
Jonathan A. Adler
501 Fifth Avenue, Suite 1408
New York, New York 10017
Tel: 212-905-0509
Fax: 212-905-0508

*Counsel for Plaintiff*

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Robert P. Lang certify that:

1.     I have the authority to make material decisions including the authority to make the decision to initiate this litigation.

2.     I have reviewed the complaint against Tower Group International Ltd. and authorize the firm set forth on the complaint to move on my behalf for appointment as lead plaintiff.

3.     The security that is the subject of this action (Tower Group International, Ltd. (NASDAQ: TWGP) was not purchased at the direction of plaintiff's counsel, or in order to participate in any private action arising under this title.

4.     I am willing to serve as a representative party on behalf of a class and I will testify at deposition and trial, if necessary.

5.     My transactions in the security that is the subject of this litigation during the class period set forth in the complaint are as follows:

Purchases:

| Date | Shares Bought | Price Per Share |
|---|---|---|
| 3/14/2013 | 500 | 17.43 |

Sales (if any):

| Date | Shares Sold | Price Per Share |
|---|---|---|

6.     I have not served as or sought to serve as a representative party on behalf of a class under this title during the last three years.

7.     I will not accept any payment for serving as a representative party, except to receive its pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 20 day of August, 2013

Signed: _____